

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

September 15, 2022

The Honorable Colleen McMahon
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

    Re:    *United States v. Jonathan Skolnick,* 19 Cr. 730 (CM)

Dear Judge McMahon:

    The Government respectfully submits this letter in advance of the sentencing of defendant Jonathan Skolnick. The applicable Guidelines range for the defendant is life imprisonment, with a mandatory term of imprisonment of 120 months. For the reasons explained below, while the Government does not oppose the imposition of a sentence below the Guidelines' sentence of life imprisonment, the Government requests a sentence that includes a substantial term of imprisonment that is longer than the 15-year sentence recommended by the Probation Office. Such a sentence would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing in light of the seriousness of the defendant's conduct, which continued over a prolonged period of time.

    **I.**    **Background**

    **A. The Defendant's Conduct**

    For over seven years, the defendant, while working as a teacher in New York City, posed as minor teenage girls online and successfully tricked minor victims into sending him sexually explicit videos and images. (PSR ¶ 16.)[1] The defendant personally knew several of his victims, many of whom were students at the schools where he was working, and he used his position of power and knowledge of the interpersonal lives of the students to his advantage in his communications with the minor victims. (PSR ¶¶ 30-32, 48.) During the time period of his crime, the defendant used 21 different email and social media accounts to contact nearly 100 different individuals and solicit nude and sexually explicit images and videos. (PSR ¶¶ 29, 48.) Through his deceit, the defendant received hundreds of images and many videos that contained child pornography. (PSR ¶ 48.) When certain minor victims stopped communicating with the

---

[1] Citations to PSR ¶__ are to the Presentence Investigation Report filed by the Probation Department on August 16, 2022.

defendant, the defendant threatened to release the photographs and images that the victims had sent. (*See, e.g.*, PSR ¶¶ 21-24.)

Specifically, between approximately August 2012 and approximately June 2018, the defendant worked as a high school teacher in Brooklyn, New York, and between approximately July 2018 and September 2019 (when the defendant was arrested), the defendant worked as an associate principal at a middle school in the Bronx, New York. (PSR ¶ 15.) While in those roles, the defendant, while pretending to be a teenage girl,[2] contacted minor victims, including his students, through email, social media messages, and text messages and engaged in sexual conversations with the victims. (PSR ¶ 16.) During the conversations, the defendant sent to the minor victims nude and sexually explicit images and videos of a female and requested that the minor victims send nude and sexually explicit images and videos in return. (PSR ¶ 16.) Many minor victims complied. In addition, when certain minor victims stopped communicating with the defendant, the defendant threatened to release the images and videos that the minor victims had sent the defendant. (PSR ¶ 16.)

For example, in ▬ 2019, the defendant, posing as several different "teenage girls," contacted a particular victim who was ▬ ("Victim-12")[3] and sent Victim-12 photographs of naked females, claiming that the photographs were of themselves. (PSR ¶¶ 18-19.) Between ▬ 2019 and ▬ 2019, in response to requests from the defendant, who posed as those "teenage girls," Victim-12 sent the defendant nude and sexually explicit photographs of Victim-12, including photographs of Victim-12's ▬. (PSR ¶ 19.) In or around approximately June 2019, Victim-12 stopped communicating with the "teenage girls." (PSR ¶ 20.) However, on ▬ 2019, one of the "teenage girls" contacted Victim-12 through a spoofed telephone number and sent threatening messages to Victim-12 which suggested that the "teenage girl" would publicly release the nude and sexually explicit photographs that Victim-12 had previously sent. (PSR ¶ 21.) The following day, Victim-12 received a threatening text message from another spoofed number. (PSR ¶ 22.) After Victim-12 tried blocking the senders, Victim-12 received an email from an email address ▬, and the email stated, "▬." (PSR ¶ 23.) After Victim-12 received that email, one of the other "teenage girls," using a spoofed telephone number, continued to threaten Victim-12. (PSR ¶ 24.)

---

[2] The Government's evidence indicates that the defendant obtained photos, including nude photos, of young women or girls online that appear to have been leaked or obtained during a hacking incident and that were subsequently used by hundreds of individuals to create fake accounts in different names. Consequently, the Government has not been able to firmly identify the young women or girls in the photos used by the defendant and cannot confirm whether they are photos of minor girls.

Many other teenagers, some of whom were former students of the defendant, also sent nude and sexually explicit images to the defendant when he was posing as a "teenage girl." For example, when Victim-2 was ▇▇▇▇▇▇, at the request of one of the "teenage girls," Victim-2 sent 9 images containing child pornography. (PSR ¶ 35.) Victim-2, like the other minor victims, did not know who Victim-2 was, in fact, communicating with the defendant. Instead, Victim-2 reported that Victim-2 felt excited when Victim-2 started receiving messages from the "teenage girls" because Victim-2 felt lonely at the time. (PSR ¶ 35.)

Similarly, Victim-3, who first started speaking to the defendant when he was ▇▇▇▇▇▇, sent the defendant 13 videos with child pornography and 38 images of erotica and child pornography. (PSR ¶ 39.) During the conversations with the defendant, Victim-3 confided in the "teenage girl" ▇▇▇▇▇▇ and that, other than female members of his immediate family, no girl had ever seen him naked. The defendant, in the persona of the teenage girl, asked Victim-3 to send a photo of "everything." Victim-3 sent a nude photo and the defendant responded "not bad for a first try[.] I'll teach you hot [sic] to do it better[.] ▇▇▇▇▇▇," referring to Victim-3's ▇▇▇▇▇▇.[4] The defendant sent Victim-3 specific instructions on how to take better nude photographs, giving him feedback on different angles and lighting, saying, among other things, "it's good that your [sic] gettting [sic] less embarased [sic] about being naked but you need to get it a lot lighter haha[.] Cuz when you have it right from the front you gotta go naked from behind too[.]" Later in the conversation, the defendant sent Victim-3 nude photographs of a young woman and said, "Show me how you ▇▇ to that[.] And I'll send more[.]" In response, Victim-3 sent a video of Victim-3 ▇▇▇▇▇▇. The defendant responded, "Nice I'm gonna send another[.] ▇▇▇▇▇▇" The defendant then directed Victim-3 to "put the cam like a few feet away so I can see your whole body while you ▇ ok?" The defendant also provided additional instructions for how the defendant should act in the videos, explaining "[y]ou should be touching all over your body like crazy.. going to town going nuts as if we're having sex and it's the most exciting event of your life." At some point, Victim-3 became suspicious about whether the defendant, posing as a teenage girl, was a real person. Victim-3 told the defendant that his conduct was "against the law" and that the defendant was a "pedophile."

When Victim-5 was ▇▇▇▇▇▇, the defendant began corresponding with Victim-5, who ultimately sent the defendant approximately 70 photographs and videos containing child pornography. In one exchange, Victim-5 explained that Victim-5 ▇▇▇▇▇▇ and that a person's "reputation" could get "ruined" for sending nude photographs. In another exchange, the defendant informed Victim-5 that Victim-5 needed to be more comfortable being naked and gave Victim-5 advice on how to relax. The defendant later commented on ▇▇▇▇▇▇ after receiving a nude picture and told Victim-5 that he needed better lighting. The defendant said, "So ▇▇▇▇▇▇ and fully relaxed about it[.]" Victim-5 responded, "▇▇▇▇▇▇" The defendant said "▇▇▇▇▇▇"

---

[4] The Government has submitted copies of longer excerpts of chats between the defendant and several of his minor victims under seal as Exhibits A through D to this sentencing submission. These excerpts are only portions some of the many similar conversations that the defendant had with his minor victims. In the chats excerpted in the exhibits, the defendant is using the Facebook messenger name "Molly Dejmal," one of his fake teenage girl personas.

Victim-5 sent the defendant another picture, to which he responded, "Good job[.] Ur ▮▮▮ and ur body is nice[.]"

In addition, when Victim-10 was approximately ▮▮▮, Victim-10 was contacted by one of the "teenage girls," and Victim-10, at the request of one of the "teenage girls," sent nude and sexually explicit images. (PSR ¶ 36.) The "teenage girl" directed Victim-10 on how to pose in the videos and images Victim-10 sent. (PSR ¶ 37.)

The defendant also persistently pressured minors to engage in sexually explicit conversations or to send him nude photographs after they refused or expressed discomfort with sharing such materials. In one example, the defendant began communicating with a ▮▮▮ victim ("Victim-13") using one of his fake profiles. After Victim-13 confided that he had never kissed anyone, did not masturbate, and did not feel comfortable sending nude photographs, the defendant repeatedly turned the conversation to sexual topics over a period of several days and pressured the victim to send photographs, saying "is there a reason you don'▮▮▮]" Later in the conversation, the defendant offered to teach Victim-13 how to take nude photographs to send to girls, saying "if your [sic] not embarased [sic] for me to see you we can do pics…. I'd guide you the whole way and we could take it slow[.]" The defendant repeatedly requested photographs, despite Victim-13 saying each time that he did not feel comfortable sending them. The next day, the defendant returned to the topic of masturbation, asking "do you ever just like play with it a little bit[?]" Two days later, the defendant renewed his request for photographs, pressuring Victim-13 to send them.

Victim-12 was also not the only minor victim who the defendant threatened and/or harassed after the victim blocked the fake "teenage girl" accounts the defendant had created. For instance, in or around 2015, when a different minor victim ▮▮▮, the defendant, posing as a "teenage girl," requested and received from that minor victim nude and sexually explicit images. (PSR ¶ 31.) When this minor victim decided to block the "teenage girl," the defendant created new accounts and continued to contact that victim. (PSR ¶ 31.) Similarly, in 2013 or 2014, when yet another victim ▮▮▮, the defendant, posing as a "teenage girl," requested and received nude and sexually explicit images from the minor victim. (PSR ¶ 32.) The minor victim blocked one of the accounts of the "teenage girls," but, several years later, the victim received additional messages from one of the "teenage girls," in which the "teenage girl" discussed the minor victim's images, the victim's ▮▮▮, and the victim's ▮▮▮. (PSR ¶ 32.) During the conversation, the defendant, using one of his fake accounts, told the victim, "Your [sic] such a shitty person[.] I am so happy I got your nudes." The victim responded, "Oh that's right[.] You are in possession of child pornography[.] I hope the cops don't find out about that." In response, the defendant called the victim a "piece of shit." In addition, using, yet another fake account, the defendant continued to ridicule the same victim, "your [sic] a real dick..▮▮▮ YOU DICK."

In addition to hiding his identity through fake email accounts and spoofed telephone numbers, the defendant also hid his identity when ▮▮▮



### B. The Search of the Defendant's Apartment and the Defendant's Arrest

On September 13, 2019, law enforcement conducted a search of the defendant's home and discovered child pornography on electronic devices belonging to the defendant. (PSR ¶¶ 25-27.) Law enforcement also found on the defendant's electronic devices, among other things, 68 images of child pornography that had been reported to the National Center for Missing and Exploited Children as part of unrelated investigations. (PSR ¶¶ 49, 53-54.)

Law enforcement also interviewed the defendant after the search. (PSR ¶ 27.) During the interview, the defendant stated, in sum and substance, the following: (i) he used email accounts to pose as teenage girls and contact minor victims; (ii) he used spoofed telephone numbers to contact at least one minor victim; (iii) he asked minor victims to send the defendant nude and sexually explicit photographs; and, (iv) while pretending to be teenage girls, he requested sexually explicit photographs from approximately 20 to 25 victims, the majority of whom were minors. (PSR ¶ 28.)

### C. Procedural Background

On April 5, 2022, the defendant pled guilty to one count of possession of child pornography (Count Three) and one count of coercion and enticement of minors to engage in illegal sexual activity (Count Four) pursuant to a plea agreement with the Government, dated December 21, 2021 (the "Plea Agreement"). Pursuant to the Plea Agreement, the parties agreed that the applicable Guidelines Range is life imprisonment, with a mandatory minimum of 120 months' imprisonment, based on a total offense level of 43 and a criminal history category of I. The offense level includes enhancements for, among other things, the fact that, pursuant to Section 2G2.1(b)(1), the offense involved minors who had attained the age of twelve years but not attained the age of sixteen years, and, pursuant to Section 2G2.1(b)(6)(A), the offense involved the knowing misrepresentation of a participant's identity to persuade, induce, entice, coerce, or facilitate the travel of, a minor to engage in sexually explicit conduct.

The U.S. Probation Office agreed with the parties' ultimate guidelines calculation[6] and criminal history calculations, and it recommended a below-Guidelines sentence of 180 months'

---

[6] The Probation Department did not group Count Three and Count Four because the defendant possessed certain child pornography that is not accounted for in Count Four. (PSR ¶ 209.)

imprisonment. The defendant requests a sentence of the mandatory minimum of 120 months' imprisonment. (Def. Sub. at 1.)

## II.   Discussion

### A. Applicable Law

The Guidelines still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Indeed, although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)-(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)   to afford adequate deterrence to criminal conduct;
(C)   to protect the public from further crimes of the defendant;
(D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B. The Court Should Impose a Below-Guidelines Sentence that Is Nevertheless Longer than 180 Months' Imprisonment

The applicable Guidelines sentence here is life imprisonment. While the Government does not oppose a sentence below the Guidelines' sentence of life imprisonment, the Government requests that the sentence imposed by the Court include a substantial period of imprisonment that is longer than the 15-year term of imprisonment recommended by the Probation Office.

---

However, the Probation Department notes that this difference does not alter the defendant's total offense level or guideline imprisonment range. (PSR ¶ 209.)

Here, the requested sentence is necessary to achieve the goals of sentencing, including to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense. The defendant's criminal conduct was extremely serious. He preyed on young victims—many of whom were his own students—using manipulation and deceit in order to persuade them to take and transmit sexually explicit photographs and videos. To succeed with his scheme, he created multiple fake social media profiles, posing as teenage girls online, using nude photographs of young women that he sent to his victims to entice them to send him sexually explicit materials. In many cases, the defendant engaged in long conversations with his victims to build rapport and flirt with his victims to persuade them to send him sexually explicit photographs and videos. In these conversations, the defendant adopted the online vernacular of a teenager—deftly using internet slang and abbreviations such as "idk" (meaning I don't know), "lol" (laugh out loud) "u" rather than "you," and typos to convincingly portray himself as a teenage girl, rather than a highly educated rabbi and lawyer. Several of these conversations are excerpted above others are included in sealed Exhibits A through D. In many of these conversations, the defendant would ask the victim about his sexual experience, his masturbation habits, and his sexual preferences. After laying the groundwork for a sexual exchange with his victims, the defendant would then begin asking them for sexually explicit photographs and videos, often sending one of the nude photographs of a young woman from his collection. The defendant also sent very explicit instructions to his victims for the types of photographs and videos he wanted—directing them to take photographs from particular angles, to show particular activities in videos, and to change their lighting and distance from the camera. The photographs and videos that the defendant requested were *explicitly* sexual in nature—he frequently requested photographs of the victims' erect penises and videos of them masturbating.

As described above, the defendant also pressured minor victims to send him nude photographs after they refused or expressed discomfort with doing so. In those conversations, he repeatedly returned to sexually explicit topics and asked again and again for photographs—teasing the victims for their "innocence" and pushing them to do things that they did not want to do.

After he received photographs from his victims, the defendant demanded more photographs and videos. In certain instances when the victims refused to send what he wanted, the defendant threatened that he would share the photographs and videos that they already sent with their friends. In some cases, the defendant actually contacted friends of his victims to show that he was willing to go through with his threats—something he was able to do only because he was a teacher, mentor, and rabbi to those victims. These threats were incredibly traumatizing to the victims. Already dealing with the stress and insecurity and challenges of being teenagers in middle and high school, the defendant threatened to humiliate them and expose them to ridicule and bullying from their peers using their most intimate moments. As a trusted advisor, the defendant knew who his victims were friends with. He understood the social dynamics at the schools in which he taught and took advantage of his role in order to manipulate and abuse his victims. This was a truly horrific abuse of trust and betrayal of the students entrusted to his care.

Further, the scale on which the defendant victimized children sets this case apart from other child exploitation cases. The defendant engaged in or attempted to engage in sexually explicit exchanges with victims for over seven years and contacted nearly 100 potential victims during that time. The defendant communicated with victims online for hours at night in an obsessive drive to

obtain more and more sexually explicit material. In light of the extensive nature of his criminal conduct, a lengthy incarceratory sentence is also necessary for general deterrence.

In his submission, the defendant highlights various sympathetic aspects of his difficult upbringing, his mental health, and the conditions of confinement while on pretrial detention.[7] These factors informed the Government's decision to offer the defendant a plea to one count of enticement and one count of possession of child pornography, rather than requiring a plea to sexual exploitation of a child. Enticement carries a mandatory minimum of 10 years imprisonment, while sexual exploitation carries a 15-year mandatory minimum. Thus, these factors have already been factored into the plea offer, and no further leniency is warranted.

The defendant claims in his submission that his conduct was not driven by sexual interest and that he is not a pedophile.[8] Instead, he claims that he requested sexually explicit images and videos from dozens of teenage victims as part of his "obsessions with the Tanner stages of puberty and with moles and ▆▆▆." (Def. Sub at 8.) However, this argument should not carry much weight. As an initial matter, the defendant is an academic, and he could have found publicly available resources to study. Additionally, the defendant's conversations with his victims were explicitly sexual in nature, and he requested photographs and videos of specific sexual acts rather than being more generally curious about their experiences with puberty. And, as laid out above, the defendant pressured victims to send him nude photographs after they said that they did not want to or said that they were not yet sexually active. Rather than simply cataloguing the information that they were not yet sexually active, he pushed them to engage in sexually explicit activity online with him. Further, the defendant's threats and aggressive communications when a victim refused to send additional photographs is also inconsistent with his explanation of that he was just interested in research. The defendant had already received information about those victims' development and stages of puberty, yet he proceeded to bully and threaten them to send more.

Moreover, it is not the case, as the defendant suggests by claiming he asked for sexually explicit material as part of a personal research project, that the defendant did not know what he was doing was wrong and illegal. As previously discussed, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

---

[7] In the defendant's sentencing submission, the defendant raises several concerns about his conditions of confinement. However, other than a couple of concerns about the defendant not receiving medication promptly—which the Government quickly addressed by speaking to prison officials where the defendant has been incarcerated—none of these other concerns have been raised to the Government and, therefore, are being raised for the first time with both the Government and the Court.

[8] When considering the conclusions of Dr. Gordon, Dr. Goldsmith, and Dr. Westphal, it is worth noting that they were all experts hired by the defendant in order to submit reports on his behalf. And Dr. McCarthy, the expert retained by Probation, relied only on the defendant's own characterization of his conduct and motivations and did not review the discovery in this case, including the defendant's communications with his victims and the sexually explicit videos and photographs the victims made at the defendant's request, in writing her report.

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ In addition, during a conversation in which the defendant was harassing a victim, the victim told the defendant that the pictures the victim had sent were child pornography. Another victim told him that possessing the victim's nude and sexually explicit photographs was against the law and that the defendant was a pedophile. The defendant has a legal degree, as well as a rabbinical degree, and he previously worked a large law firm in England. Thus, there should be no doubt that, when confronted by his very victims that what he was doing was against the law, he knew his conduct was illegal. Despite being confronted, he continued requesting more child pornography. Finally, the very fact that the defendant solicited sexually explicit images and videos by using fake email accounts and spoofed telephone numbers shows that the defendant knew that there was something improper about his requests. Otherwise, the defendant would have solicited this material from his students in person, using his own name. But the defendant knew he could not do that. He knew what he was doing was wrong.

Despite his claims to the contrary, there should also be no doubt that the defendant knew that his conduct could harm the victims. As described above, Victim-5 told the defendant that Victim-5's life and reputation would be ruined if nude and sexually explicit photographs were shared publicly. Moreover, the fact that the defendant threatened to release photographs and videos of certain victims when they stopped responding shows that he knew that publicly releasing these items would humiliate the victims. The defendant used this knowledge to his advantage when he threatened certain victims in an effort to get them to continue talking to him and send more images and videos.

Finally, even if the defendant solicited child pornography for a personal research project, the defendant's motivation for his prolonged and extensive sexual exploitation of minors has no bearing on the harm caused by his incredibly serious conduct on the dozens of victims and their families. Regardless of whether he solicited videos of his victims masturbating for sexual gratification or for a personal research project, he still manipulated and deceived his victims—many of whom were his students—into sending him child pornography. He betrayed his position of trust as their teacher and rabbi in order to trick them into sending him these materials and that conduct traumatized his victims regardless of why he did this. The defendant's victims will be dealing with the impact of his conduct for the rest of their lives and the harm done to them is incredibly serious.

### III. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a substantial term of imprisonment that is longer than the 15-year sentence recommended by the Probation Office.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By: _____/s/_____
Rebecca T. Dell
Elizabeth A. Espinosa
Assistant United States Attorneys
(212) 637-2198/2216

cc: Defense counsel (*by Email*)