# M&B
## MOSKOWITZ & BOOK, LLP

Avraham C. Moskowitz
AMoskowitz@mb-llp.com

345 Seventh Avenue, 21st Floor
New York, NY 10001
Phone: (212) 221-7999
Fax: (212) 398-8835

September 8, 2022

By Email
Hon. Colleen McMahon
U.S. District Judge
U.S. Courthouse
500 Pearl Street
New York, NY 10007

Re:     United States v. Jonathon Skolnick
             19 Cr. 730 (CM)

Dear Judge McMahon:

Jonathon Skolnick ("Jon") is not a pedophile.  Nor is Jon a predator. Rather, as will be discussed in more detail below and as described in the attached psychological evaluations, Jon is a highly intelligent and accomplished individual who suffers from redacted , and a multitude of related psychological and emotional problems, including redacted , all of which contributed significantly to his inexcusable and almost inexplicable criminal behavior in this case. Although Jon's reprehensible conduct deserves to be punished, it is respectfully submitted that an evaluation of the §3553(a) factors, as they apply to this case, supports the conclusion that the ten-year mandatory minimum sentence is more than sufficient to achieve the statutory goals of sentencing. The statutory minimum sentence should therefore be imposed on Jon in this case.

## A.  Jon's Personal History

Jon is a 40-year-old native of England who has lived in the United States since 2011. The oldest of two sons born to his now deceased parents, Ian and Mindy Skolnick, Jon earned a law degree from Cambridge University, a Master's in Jewish Education from Yeshiva University and rabbinical ordination from the Chief Rabbi of the Jerusalem Rabbinical Court. After a short and undistinguished career as a big-firm lawyer at Linklaters in London, Jon began a career in Jewish education, first teaching at the Yeshivah of Flatbush High School and subsequently becoming an Assistant Principal at SAR Academy in Riverdale, New York.

Hon. Colleen McMahon
September 8, 2022
Page 2


Jon's academic and professional success was achieved despite a personal background that includes being raised in a dysfunctional family redacted , and who failed to recognize or obtain treatment for Jon's myriad redacted disorders.

Jon's psycho-social history is set forth in detail in the comprehensive report prepared by Dr. Simone Gordon, D.S.W., a copy of which accompanies this letter as Exhibit A. The facts Dr. Gordon learned in the course of her investigation are incorporated by reference and will not be repeated at great length herein. Certain salient facts are worth emphasizing, however, because they reveal how the extreme difficulties that Jon faced growing up impacted his development, contributing to his current predicament.

Jon's mother, Mindy, was a teacher who did not return to work immediately after Jon was born, but later resumed her career when Jon started school. Jon's father, Ian, was an accountant. Their relationship was cold and loveless. Jon's parents redacted , never displayed any affection to each other (or to their children) and often went months or years without talking to each other. Neither of them knew how to parent, and they were particularly ill-suited to raise a child with Jon's many problems.

Much to his parents' frustration, Jon was an unusual child. Ian, who died of COVID-19 shortly after Jon's arrest, told Dr. Gordon that he realized that Jon was "special," and not like ordinary children, when Jon was very young. Intellectually, Jon was always advanced for his age, but he suffered from redacted deficits that became evident at an early age, continued through his childhood and adolescence, and were diagnosed in adulthood as symptoms of redacted Among other redacted issues, Jon exhibited redacted . The fact that he was physically slight and immature, coupled with his behavioral oddities, made him an outcast and object of ridicule among other children, which predictably caused him to withdraw even further into his world of private fixations and further limited his social development during early childhood.

Ill-equipped to handle a child whose behavior they found odd and off-putting, Jon's parents became abusive. While Mindy was controlling and emotionally abusive, Ian was physically abusive towards Jon. When Jon disappointed his mother, she would respond by telling him that she "rued the day she ever had him.", Jon, who used to hide in the closet to try to avoid being beaten, recalls one occasion on which Ian kicked him down a flight of stairs, causing him to break a finger.

As Jon's limitations and peculiarities became more pronounced, his mother responded by degrading him and announcing that "I have a handicapped kid hanging around my neck." However, despite their derisive references to Jon as "handicapped," neither Ian nor Mindy realized that the behaviors that they attributed to Jon's brilliance and willfulness were actually indicative of redacted disorders. Consequently, Jon's redacted remained undiagnosed and untreated throughout his formative years.

In elementary school, Jon performed well academically but suffered socially. He remained physically smaller than most children his age, was socially immature, and moved in an unusual way other children found odd and off-putting. Jon had trouble writing because he couldn't hold a

Hon. Colleen McMahon
September 8, 2022
Page 3

pen or pencil properly. When his parents could no longer ignore the fact that Jon had problems, they took him to be evaluated and he was diagnosed with  redacted                          .

Jon's social problems worsened when he entered middle school. Children can be cruel to those who are different, and Jon was bullied and ridiculed by his peers. Because of his undiagnosed redacted    , Jon was unable     redacted                                         .
Isolated from his peers, he spent hours alone watching television,   redacted         .  According to Jon's brother Daniel, Jon simply did not know how to be a kid or understand how to interact with his peers in the way an ordinary child might. "He was only comfortable being in an academic role. He regurgitated facts. Jonny never recognized that kids want someone who can play, not someone who is regurgitating facts all the time."

Jon's social problems continued through his high school years. Jon remained small and physically under-developed for his age. When he was fourteen years old, he looked like an eight-year-old. His peers ridiculed him, calling him "monkey" because he was clumsy and had odd body movements. Children he considered friends consistently excluded him from social activities.

In early adolescence, Jon became acutely self-conscious of his diminutive size, his physical immaturity, and redacted. His mother sent him away to summer camp, where he was required to shower with other young men who ridiculed him for his lack of development, specifically his lack of pubic and underarm hair. As noted at page 27 of Dr. Gordon's report, the ridicule he experienced during early adolescence had an enduring impact:

> The shaming, humiliation and ridicule that Jonny experienced when
> he was a fourteen and fifteen year-old adolescent marked him for life.
> He felt "different" from his peers, and he started to obsess about his
> body: he worried if his body would ever be correct.

During his delayed puberty, Jon also noticed that his redacted, making him even more self-conscious about his body. Jon began to mutilate his body redacted. He began showing symptoms of     redacted                              . Jon became fixated on redacted and his delayed development and pre-occupied with his body and his perception that his body was flawed. As discussed in Dr. Gordon's report, this obsession continued to plague Jon through his adolescence and into adulthood and played a significant role in the charged criminal behavior.

During his high school years, Jon excelled academically while continuing to suffer socially. Indeed, it is likely that Jon's social isolation contributed to his academic success, as he was able to concentrate on his studies without the typical social distractions faced by most high school students.

After graduating high school, Jon spent a gap year at a yeshiva (religious school) in Israel. There, he met Rabbi Bina, a prominent and controversial teacher and Talmudic scholar, who would have a big influence on Jon over the next decade. While in Israel, Jon applied to and was admitted into Cambridge University to study law. He returned home to London after his gap year and began his studies at Cambridge, where he once again found himself isolated socially. He did

Hon. Colleen McMahon
September 8, 2022
Page 4


not feel comfortable with the non-Jewish students and felt that he did not fit in with the Jewish students. In an effort to learn how to redacted. He also continued to obsess about pubescent development because of his own delayed development. When he discovered the Tanner Classification of Pubescent Development, he studied it obsessively to determine where he fit.[1]

      Upon completing his studies at Cambridge, Jon got a job offer at Linklaters, a large London-based law firm. At the same time, he was under pressure to settle down and get married, though Jon had never gone on a date or even socialized with a woman. His rabbi introduced Jon to a young woman and after a few dates, they surprised Jon's parents by becoming engaged. The engagement did not last long, and Jon has not dated anyone else since that time.

      After Jon's engagement broke off, he decided to return to Israel to study again in Rabbi Bina's yeshiva before beginning his legal career. After several months, Jon returned to England to begin his short-lived and ill-fated legal career. Jon was assigned to the department that focused on taxes and pensions, where his facility with numbers could be put to good use. Jon quickly realized that he hated the practice of law and after approximately two years, he was laid off during the global recession in 2008-09.

      After losing his job at Linklaters, Jon was invited by Rabbi Bina to return to his yeshiva to study for his rabbinic ordination. To help Jon pay for his studies, Rabbi Bina offered him a job mentoring younger yeshiva students. Although Jon had no real interest in becoming a rabbi, his admiration and respect for Rabbi Bina led him to accept the invitation and return to the yeshiva. Once again, Jon was successful in his studies. He earned his rabbinic ordination, but his social awkwardness made him less successful as a mentor and counselor to the younger students. Jon felt comfortable when he had to speak to the students about Jewish law and the rules that they were required to follow, but he had no idea how to discuss real life problems with them. He tried to emulate Rabbi Bina's empathetic style, which often involved hugging and kissing students on the head or face, but when he did so, his actions were misinterpreted and considered inappropriate. Ultimately, Jon's relationship with Rabbi Bina soured. On the recommendation of another student, Jon left the yeshiva and moved to New York, to study for a master's degree in Jewish Education at Yeshiva University.

      Jon's tenure at Yeshiva University was marked by increased social isolation and anxiety. He rarely, if ever, left the confines of the campus in Washington Heights and found it difficult to perform simple daily tasks such as paying bills or calling a taxi. When he had to apply for a job, he would only apply online, because he found it hard to make phone calls. Jon was surprised when, after attending a job fair, he was offered a teaching job at the Yeshivah of Flatbush High School, a prestigious, Modern Orthodox, Jewish school catering to the Syrian Jewish community in Brooklyn.

---

[1] Tanner Staging, also known as Sexual Maturity Rating (SMR), is an objective classification system that providers use to document and track the development and sequence of secondary sex characteristics of children during puberty. NIH, National Library of Medicine, Tanner Stages, Mickey Emmanuel and Brooke R. Bokor, updated December 15, 2021.

Hon. Colleen McMahon
September 8, 2022
Page 5

Following completion of his master's degree, Jon moved to Brooklyn, where he again found himself socially isolated and anxiety ridden. Jon rarely left his apartment, except to go to work, to synagogue, or to the grocery store. The high school environment, in which he was surrounded daily by adolescent boys, increased Jon's redacted. Specifically, Jon could not control his compulsive need to compare redacted. It is those obsessions—and not any form of sexual interest in adolescents—that ultimately led him to engage in the charged criminal activity.

In considering Jon's conduct, it is important to note that both Dr. Gordon and Dr. Eric Goldsmith, M.D., a forensic psychiatrist retained by the defense to evaluate Jon, concluded that *Jon's criminal behavior was not driven by a sexual interest*. Indeed, even Dr. Jennifer McCarthy, the expert retained by the Probation Department, concurred in that conclusion. Dr. McCarthy wrote, "Mr. Skolnick's involvement in the offense does not appear to be sexually motivated but a consequence of his immaturity, poor decision making/judgment,    redacted .'" (See report of Dr. Jennifer McCarthy, attached hereto as Exhibit B at p. 20). Dr. Goldsmith, whose report is attached hereto as Exhibit C, concluded, to a reasonable degree of psychiatric certainty, that Jon suffers, *inter alia*,   redacted        . Dr. Alexander Westphal, Associate Professor of Psychiatry in the Division of Law and Psychiatry at Yale University   redacted . A copy of Dr. Westphal's report accompanies this submission as Exhibit D. Most significantly, Dr. Goldsmith opined, to a reasonable degree of psychiatric certainty, that Jon's criminal behavior was motivated by  redacted        . Thus, Dr. Goldsmith wrote

> Jonathon Skolnick evidences  redacted                . Mr. Skolnick's obsession with collecting data on redacted and comparing both to his own redacted was the primary driver for his behavior…. His behavior was not driven by a sexual interest.

It is also important to note that Drs. Gordon, Goldsmith and McCarthy all concluded that Jon is not a pedophile, and if he is given appropriate mental health treatment, he poses no risk of engaging in a contact offense with a child and is not likely to reoffend. Thus, Dr. McCarthy wrote

> Characterologically and despite the nature of his offense, Mr. Skolnick does not impress as predatory or antisocial. Currently he impresses as low risk for reoffense, as long as he participates in mental health treatment (which is highly recommended) to address the various mental health issues outlined in this report and remains compliant with his psychotropic regimen.

(Ex B. at p. 20). Moreover, all three doctors who evaluated Jon for the defense concluded that because of  redacted    , a lengthy prison sentence would be harmful to him. Thus, Dr. Goldsmith wrote

> It is my opinion to a reasonable degree of psychiatric certainty that because of Jonathon Skolnick's features redacted       , a lengthy prison sentence would be harmful for him. Jonathon Skolnick

Hon. Colleen McMahon
September 8, 2022
Page 6

> evidences  redacted            , which would make a lengthy prison
> sentence, especially psychologically distressing and harmful…

Dr. Westphal, in a separate letter (Exhibit E hereto) addressing the impact of incarceration on a person with  redacted     wrote

> I would urge you to consider Mr. Skolnick's vulnerabilities, his first-
> time offender status, together with the non-violent nature of his
> offense, and direct him towards a supportive environment that offers
> therapy,  redacted     and which ultimately gives him the best chance
> at rehabilitation. Mr. Skolnick's life is already devastated. Continuing
> to keep him in the current environment is cruel.

## B.  The Advisory Sentencing Guidelines

As the Supreme Court has repeatedly explained, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Peugh v. United States*, 569 U.S. 530, 536, 133 S. Ct. 2072, 2080 (2013) (*quoting Gall v. United States*, 552 U.S. 38, 49 (2007)).  In an ordinary case, the correctly-calculated Guidelines range is "the lodestar" that "anchor[s]" the district court's discretion. *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345-46 (2016) (citation omitted).

However, as the Supreme Court has also explained, guidelines that are not supported by empirical data are entitled to less deference than are guidelines that result from the Sentencing Commission's "exercise of its characteristic institutional role" as an expert agency tasked with promulgating empirically based guidelines. *Spears v. United States*, 129 S. Ct. 840, 842-43 (2009) (internal quotation marks omitted).  The guidelines that apply in this case are of the former kind, and the Guidelines calculation therefore provides little relevant guidance.

Jon faces sentencing for child pornography offenses, and guideline sentences for such offenses have been raised at the direction of Congress in recent decades—often over the express objections of the Sentencing Commission.  *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010) (describing distribution Guideline as "fundamentally different from most" and likely to lead to unreasonable sentences "unless applied with great care").[2]

As applied to Jon, the Guideline governing production, 2G2.1, is as flawed as the Guideline examined in *Dorvee*, which governs possession and trafficking.  As set forth in detail

---

[2] Although *Dorvee* dealt with Guideline 2G2.2 and this case involves the application of Guideline 2G2.1, the *Dorvee* Court's criticisms of and concerns apply with equal force to the guidelines at issue here.  *See*, *e.g.*, *United States v. Brown*, 843 F.3d 74, 89 (2d Cir. 2016) (Pooler, dissenting) ("Although *Dorvee* did not produce child pornography, much of the *Dorvee* court's criticism of the child pornography guidelines applies to the guidelines for production offenses as well.  As with the guidelines for trafficking in child pornography found in Section 2G2.2, the Sentencing Commission did not use an empirical approach to develop the production guidelines found in Section 2G2.1. Instead, the Commission has increased the base offense level and added enhancements for production offenses 'usually as a result of congressional directives.'") (citation omitted)

Hon. Colleen McMahon
September 8, 2022
Page 7

above, Jon is not the ordinary producer of child pornography—indeed, were there a subjective
intent requirement, Jon would not be before the Court, because he did not intend to produce
"pornography."  Jon is not a pedophile, his interest was neither prurient nor financial, and he
presents no physical danger to children.  Nor did he cause images to be created with the intent of
distributing them to others who might have a prurient interest or pose a danger.  Accordingly, the
run-of-the-mill enhancements that apply to Jon's case have the effect of driving up his Guidelines
range to an irrational extent.  In particular, Jon's offense level is driven by the fact that there is
more than one victim.  That fact is worthy of consideration when imposing sentence, but it is
respectfully submitted that applying multiple enhancements as a result of that fact dramatically
overstates its importance---and here, that fact increases Jon's base offense level by ten levels,
based on two separate enhancements that each requires a five-level increase.  Under the
circumstances, the applicable Guideline "cannot 'bear the weight assigned it' because [this]
cumulation of repetitive, all-but-inherent, enhancements yield[s] … a Guideline range that fail[s]
to distinguish between [Jon's] conduct and other offenders whose conduct was far worse." *United
States v. Jenkins*, 854 F.3d 181, 190 (2d Cir. 2017).  A Guidelines sentence would be irrational,
manifestly unjust, and even substantively unreasonable under these circumstances and in light of
the Section 3553(a) factors discussed below.

### C.  The §3553(a) Factors Support a Mandatory Minimum Sentence

Jon's criminal conduct was serious and inexcusable, but it does not warrant a guidelines
sentence of life or even the fifteen-year sentence recommended by the Probation Department.
Consideration of the §3553(a) factors as they apply in this case supports the conclusion that
imposition of a ten-year mandatory minimum sentence would be sufficient, but not greater than
necessary to achieve the statutory objectives of sentencing.

### 1.  The Nature and Circumstances of the Offense

The basic details of Jon's criminal conduct are accurately described in the presentence
investigation report ("PSR") prepared by the Probation Department and accordingly will not be
discussed in detail herein. Although Jon's behavior is abhorrent, it is significant to note that his
conduct is not typical of the type of cases involving the enticement or coercion of minors to create
child pornography that are usually prosecuted in this courthouse. Specifically, as previously noted,
Jon did not seek the illegal photographs out of some perverse desire for sexual gratification, but
rather because of his obsessions with the Tanner stages of puberty and redacted, both of which
were the result of his  redacted     . In a real sense, because of    redacted              , Jon did
not realize that he was enticing teenage boys to produce child pornography, but instead thought
that he was simply researching the Tanner stages of puberty and redacted each of the teenagers
who provided photographs. Moreover, this case is unique in that Jon did not obtain the photos for
financial gain or for the purpose of exchanging them for other images of child pornography.
Indeed, there is no evidence or suggestion that Jon shared the pictures with anyone.

Hon. Colleen McMahon
September 8, 2022
Page 8

    2.   **The Need for the Sentence to Reflect the Seriousness of the Offense, Promote Respect for the Law and Provide Just Punishment**

        Jon's criminal conduct was indisputably serious, but it is certainly not among the most egregious cases of enticing minors to create child pornography that has been prosecuted in this District. This case does not involve infants or preteens who were forced to pose for illegal pictures, nor was there any violence against the victims or any sexual contact with the victims. Simply put, this case involved a man suffering from  redacted  who convinced teenage boys to send pictures to a stranger they believed to be an eighteen-year-old girl. As serious as the conduct was, especially given Jon's role as an educator redacted, a ten-year mandatory minimum sentence is more than sufficient to reflect the seriousness of the offense.

        Nor is a Guidelines sentence necessary to promote respect for the law. It is respectfully submitted that respect for the law would best be promoted by imposing a mandatory minimum sentence of ten years, because such a sentence would indicate that our criminal justice system can distinguish between predators who prey on children for sexual gratification or financial enrichment, and individuals like Jon, whose  redacted  disorders cause them to violate the law.  A ten-year sentence is very substantial by any measure, especially when imposed upon a nonviolent first offender with treatable  redacted  problems.  Accordingly, nobody observing Jon's circumstances would conclude that he got off easy and that the legal system is therefore unworthy of respect if a mandatory minimum sentence were imposed.

        A mandatory minimum sentence would also be sufficient to provide just punishment for Jon.  The theory underlying the child pornography laws—and the heightened penalties imposed by statute on those who violate them—is twofold.  First, child pornography creates a permanent record of abuse, and the use of computers to distribute that permanent evidence perpetuates and potentially exacerbates the harm initially suffered by the victim whose abuse has been recorded. Second, distribution of such images to collectors encourages abuse of children, because additional images are required to meet market demand among collectors. *United States v. R.V.*, 157 F. Supp. 3d 207, 209 (E.D.N.Y. 2016).  Jon's case does not significantly implicate either of these underlying concerns.  Jon had no physical contact with any of the victims, none of whom were subjected to violence of any kind, and none of the images created by those victims were ever distributed or intended for distribution.  A just punishment therefore does not require any of the enhanced penalties typically associated with child pornography prosecutions.

        Finally, in considering what punishment would be just, the Court should remain mindful of the role Jon's redacted conditions played in his offense.  As noted by  redacted  , "judges are recognizing that treatment or drastically reduced incarceration is the best way to handle child pornography cases involving a defendant  redacted  .
Had Jon been properly diagnosed and treated when he was growing up, there can be no doubt that he would never have engaged in the charged criminal conduct. Jon has spent almost his entire adult life trying to educate and help teenage boys and would never have intentionally hurt them. Unfortunately, his disorders drove him to behave in a way that is inconsistent with the way he has lived the rest of his life. While punishment is necessary, a sentence greater than the ten-year

Hon. Colleen McMahon
September 8, 2022
Page 9

mandatory minimum would be greater than necessary to reflect the seriousness of the offense, promote respect for the law and provide just punishment in this case.

###   3.  <u>Specific and General Deterrence</u>

A sentence greater than the ten-year mandatory minimum is not necessary to achieve the objectives of specific and general deterrence in this case. First and most importantly, the scientific/medical evidence available in this case supports a mandatory minimum sentence. Thus, it is the unanimous opinion of the four experts who have evaluated Jon that he is not a danger to reoffend. Thus, Dr. Westphal, redacted       from Yale, concluded, as did Drs. Gordon, Goldsmith and McCarthy that

> Overall, it is my impression that Mr. Skolnick didn't fully understand the implications or nature of his actions, largely because of the impact that redacted              , had on his social development. In addition, his actions may also have been fueled by redacted             . Mr. Skolnick is remorseful, regrets his actions, and would, in my impression be an excellent candidate for rehabilitation, with an extremely low likelihood of reoffending.

Ex. D at p. 26. Moreover, as Dr. Westphal notes in his letter dated November 10, 2020, a copy of which is annexed hereto as Exhibit E, the conditions in prison are particularly hard on people suffering from redacted        .Thus, Dr. Westphal writes,

> redacted                       condition that is defined by       redacted
> .

> The redacted       disability makes the person more vulnerable to a variety of problems in prison. Prison is an intensely social environment, with complex mechanisms at play in both the inmate population (e.g. establishing hierarchies) as well as between the correctional officers and the inmates. In the absence of the redacted skills necessary to navigate this complex environment, life in prison is much more difficult for people redacted     . For example, they are particularly vulnerable to being taken advantage of, are more likely to be bullied, and may not redacted        .

> In addition, redacted                      may make the environment far more severe and harsh than for a person without redacted       . Mr. Skolnick has described the environment as excruciating, and there is good reason, based on his disorder, that it may be more excruciating for him than for other people. He is hypersensitive to      redacted                .

Hon. Colleen McMahon
September 8, 2022
Page 10


Dr. Westphal's description of the difficulties faced by inmates with   redacted      has
proven prescient with respect to Jon,   redacted      (see PSR, ¶174). There can be no doubt that
the additional difficulties that Jon is experiencing in prison as a result of   redacted
give him an added incentive to avoid reoffending and should give the Court confidence that Jon
will do everything humanly possible to avoid going back to prison.

Jon's sincere remorse is reflected in his emotional letter to the Court, which is attached
hereto as Exhibit F. In his letter, Jon describes how he is tormented by the realization that he has
hurt his former students.

> I wanted to write to you to express my overwhelming shame and
> disgust at myself for the disgusting crimes I have committed and the
> tremendous wrong that I have done. I must take responsibility for the
> pain, the damage and the harm that I have caused.
>
> There are no words to express the level of shame that I feel over my
> despicable actions. I am ravaged with guilt, eaten up by it always.
>
> In the words of Cain, confronted by God after killing Abel, "my sin
> is too great to bear." Your Honor, my feeling of disgust and shame
> over what I did keeps me up at night and haunts me throughout the
> day. Since I have been in jail, I can count on one hand the number of
> times my conscience has allowed me to sleep through the night. Even
> 3 years later, when I fall asleep nightmares about my guilt wake me
> up in the night and I carry the horror of my colossal moral failure with
> me in my heart and my mind all day long…
>
> I am devastated by my failures and the pain and hurt that I have caused
> through them. I have shamed my community, I have harmed children,
> I have injured people I have never met, I have betrayed students and
> I have brought disgrace on my family. This is what I think about and
> meditate on all day every day.
>
> I am disgusted with myself, sickened that I can stoop so low and
> repulsed by the repugnance of my deeds. I have committed one of the
> cardinal sins of Judaism, behaving in a way that profanes the name of
> God. I have sinned against man and God and I know no respite.  My
> actions are a legacy of shame and a mark of Cain upon me. I can never
> live them down.

While it is common for defendants to express remorse at the time of sentencing, Jon has
used his time in prison to try to make amends for the harm his actions have caused by helping
other inmates in any way possible. Thus, in his letter to the Court, Jon writes

Hon. Colleen McMahon
September 8, 2022
Page 11

> I have tried to make the best of my time in jail. For 10 months I
> worked almost every day in suicide watch. Having hurt other people,
> including people I had a duty to care for, I was looking for a way to
> help people and I found a chance to do so caring for suicidal inmates,
> trying to help them find hope in their darkest hours. I was also the
> library clerk in MCC for about 9 months where I catalogued the entire
> library by myself and helped facilitate the educational programming.

See also, MCC certificates attached hereto as Exhibit H and letters from three fellow inmates, attached hereto as Exhibit I.

Jon's heartfelt remorse combined with the consensus of opinion from the mental health professionals that Jon does not pose a risk of reoffending should lead the Court to conclude that a ten-year mandatory minimum sentence is more than sufficient to protect the public from future crimes by Jon, especially considering that upon his release from prison, he will be deported.

As for general deterrence, it is respectfully submitted that any rational person capable of being deterred, who becomes aware of the facts of this case, would view a sentence of ten years in prison as a significant deterrent, especially considering the harsh conditions of confinement which Jon has experienced at the MCC and MDC since his arrest (See Discussion at Point 5, below). In that regard, it should be noted that because his family lives abroad and his former friends and colleagues are afraid or embarrassed to be seen with him, Jon has been completely isolated from the outside world and has not had a single visitor since his arrest, other than counsel and the mental health professionals who evaluated him. Indeed, when considering the need for general deterrence, it is noteworthy that Jon's offense has rendered him *persona non grata* in his personal and professional communities—a fate no person capable of being deterred would risk when deciding whether or not to commit a similar offense. For example, several of Jon's former colleagues, with whom counsel has been in contact, have declined to write letters on his behalf, not because they don't want to support his quest for a mandatory minimum sentence, but because they fear that if they express any public support for Jon, they will be fired from their jobs and will not be employable in Jewish education. In fact, several teachers who worked with Jon and were interested in writing letters on his behalf were explicitly prohibited from doing so by the administration of their schools. In sum, Jon has lost his livelihood, his friends and his reputation and will be a pariah in the Jewish community upon his release. It is simply inconceivable that anyone who is capable of being deterred would decide that it is worth risking similar punishment in order to commit a crime like the one committed by Jon.

4. **The Need to Provide the Defendant with Educational or Vocational Training or Medical Care**

A sentence longer than the ten-year mandatory minimum is certainly not necessary to provide Jon with educational or vocational training or medical care. Jon is a highly educated individual with many skills and talents who will be able to find a job upon his release, if anyone is willing to hire a person convicted of a child pornography offense. It is ludicrous to think that the Bureau of Prisons ("BOP") can provide Jon with any sort of training that will make him more

Hon. Colleen McMahon
September 8, 2022
Page 12

employable upon his release. As for medical care, it is highly unlikely that the BOP will be able to provide Jon with the type of  redacted  help that he needs to deal with the problems created by his  redacted  .  As Your Honor knows, the medical care provided by the BOP is abysmal and often non-existent and the mental health care is even worse, with no real therapy being offered outside of psychotropic medications.  Jon recognizes that he will require psychological and psychiatric treatment for the rest of his life and he fully intends to seek such care upon his release. There can be no doubt that Jon will get better psychological and psychiatric care outside of prison than he will ever get in prison and thus, there is no need to impose a sentence longer than the mandatory minimum to achieve this objective of sentencing.

5.  **The Horrific Conditions of Confinement Jon Has Experienced Justify a Mandatory Minimum Sentence**

Finally, in considering what sentence to impose on Jon, the Court should grant the limited leniency it can, because of the extraordinarily difficult conditions of confinement he has experienced during his pre-sentence incarceration.  Jon has been detained since September 13, 2019, first in the now-closed MCC and then at the MDC, in conditions that have been extraordinarily difficult and in fact, could be described as brutal, disgusting, and inhumane.

As the Court is well aware, the New York area's pretrial holding facilities have been rocked by repeated scandals over conditions of confinement over the course of the last decade, and especially after the August 2019 death of Jeffrey Epstein at the MCC.  When COVID arrived in early 2020, it brought those long-standing problems to a head.  The coronavirus turned overcrowded detention centers, including the MCC and MDC where Jon has been housed, into petri dishes, placing inmates in a heightened state of vulnerability to infection. Moreover, during the period of Jon's incarceration, both the MCC and MDC have imposed numerous lockdowns, both for health and security reasons, making the conditions of confinement even harsher, particularly for an inmate like Jon, who suffers from  redacted  .

In terms of exposure and harm, the risks the pandemic posed to Jon and other inmates was profound. Some of the failed measures included a lack of cleaning supplies, poorly implemented and incomplete isolation, and a deficient quarantine process.  Jon and his fellow inmates could not practice social distancing, control their exposure to large groups, practice increased hygiene, wear protective clothing, obtain specific products for cleaning or laundry, avoid high-touch surfaces, or sanitize their personal spaces.

Attached hereto as Exhibit G is a letter redacted  to the Court describing, in excruciating detail, the cruel and inhumane conditions and treatment  redacted  at the MCC and MDC. In reading  redacted  letter, it is hard to imagine that our great country, which prides itself on its commitment to human rights and the dignity of all people, actually treats human beings so cruelly and callously. The conditions and treatment  redacted  are as horrific as those we routinely deplore in countries such as Colombia and Turkey.  Thus, in describing the conditions at the MCC,  redacted  writes redacted

Hon. Colleen McMahon
September 8, 2022
Page 13

Redacted description of the conditions and the treatment of inmates at the MDC is equally
unsparing. He relates how, on his first night at the MDC, he was not given a mattress and had to
try to sleep on a metal frame. The next day, redacted was given a mattress that was less than an
inch thick in the center and consequently, after about a week, he began to limp. Fortunately, one of
the gang members who ran the unit took pity on him and brought redacted a standard issue
mattress, after the guards ignored redacted repeated requests for a standard mattress. Redacted also
describes being housed in a cell for four weeks in which the toilet flushed continuously, 24/7,
making it impossible to sleep, because the toilet was a few feet from his head.

The most harrowing part of redacted descriptions of the conditions in the MCC and MDC
is the description of the various lockdowns he experienced, none more terrifying than the thirteen-
day lockdown of the MCC that began on February 28, 2020, when the authorities were searching
for a gun smuggled into the facility by a corrections officer. Redacted writes that the lockdown
and the violence associated with it has damaged him psychologically to the extent that he is still
traumatized, more than 2.5 years later. Redacted writes

redacted

In recognition of the horrific conditions of confinement that have predominated since early
2020, district judges have become unusually outspoken about problems at pretrial holding
facilities and have regularly taken COVID-related matters into account at sentencing, as mandated
by 18 U.S.C. 3553(a).  Judges in both SDNY and EDNY, including Your Honor, have imposed
lighter prison sentences as a result of the coronavirus pandemic, often citing brutal conditions of
confinement and the BOP's failure to protect inmates from COVID-19 breakouts.[3]

According to a 2021 review of 43 cases by the *New York Daily* News, several SDNY
judges handed down sentences that were an average of 58 percent lower than what federal
guidelines recommended.[4]  In nearly all those cases, the sentencing judges identified the brutal,
severe, and traumatic prison conditions that have predominated since 2020 as a factor warranting
substantially below-Guidelines sentences.  In May 2020, before an additional twenty-nine months

---

[3] See, e.g., *United States v. Gonzalez*, 19 Cr. 467 (PKC); *United States v. Amado-Ortiz*, 19 Cr. 923 (JMF); United
States v. Chavis, 19 Cr. 620 (DLC); *United States v. Paulino*, 19 Cr. 607 (AJN); *United States v. Camacho*, 19 Cr.389
(CM); *United States v. Nettles*, 20 Cr. 509 (KAF); *United States v. Alfaro-Diaz*, 20 Cr. 305 (DLC); *United States v.
Rivera*, 17 Cr. 290 (GHW); *United States v. Browning*, 20 Cr. 2 (VSB); *United States v. Soto*, 19 Cr. 903 (KMW);
*United States v. Martinez*, 18 Cr. 669 (JPO); *United States v. Agosto*, 19 Cr. 759 (ALC); *United States v. Herman
Steward*, 20 Cr. 52 (DLC); *United States v. Carlos Alberto Ramirez*, 20 Cr. 29(JPO).  Judges in the Eastern District of
New York have made similar rulings. See, e.g., *United States v. Battle*, 20 Cr. 349 (EK); *United States v. Sepulveda
and Olivier*, 19 Cr. 229 (PKC).

[4] Stephen Rex Brown and Noah Goldberg, *Brutal conditions in NYC jails during COVID pandemic caused federal
judges to impose* lighter *sentences: analysis*, New York Daily News (July 11, 2021), *available at*
https://bit.ly/3FudDAp (last visited October 10, 2021).

Hon. Colleen McMahon
September 8, 2022
Page 14

of consistent lockdowns made conditions even worse for inmates, conditions were already so bad that Judge Oetken, while imposing a time-served sentence in a narcotics case, found them so much more punitive than usual that "it's essentially the equivalent of either time and a half or two times what would ordinarily be served." *U.S. v. Daniel Gonzalez*, 18 Cr. 669 (JPO), Sentencing Proceeding (S.D.N.Y. April 2, 2020). You Honor "firmly" agreed with Judge Oetken "that we should be providing some extra time for anybody who spent time in MCC or MDC during this lockdown." *U.S. v. Tiffany Days*, 19 Cr. 619 (CM), Sentencing Proceeding at 11 (S.D.N.Y. April 29, 2021). In that case, Your Honor found the conditions at the local federal jails to be "disgusting, [as] inhumane as anything I've heard about [in] any Colombian prison" and "significantly worse than… anyone thought possible in the last 400 years in a federal jail in America." *Id.*

Jon already has served three years in pre-trial / pre-sentence detention under conditions that were already extraordinarily difficult before the pandemic, and that became almost incomprehensibly cruel with the onset of the COVID pandemic and the numerous lockdowns that have been imposed over the last two and a half years. Although this Court has long been aware of the horrific conditions at the MCC and MDC and has courageously taken the lead in pressing for improvements,   redacted    letter detailing   redacted    experiences at the MCC and MDC sheds new light on those conditions and fully warrants an exercise of leniency. It is respectfully submitted that a mandatory minimum sentence of ten years is more than sufficient punishment for the crime that Jon committed. To impose a sentence longer than ten years would be cruel and inhuman given all that Jon has already gone through and considering the extra degree of hardship that he will continue to experience as a result of his redacted        .   A ten-year sentence is punishment enough and will achieve all of the sentencing objectives articulated in §3553(a).

Hon. Colleen McMahon
September 8, 2022
Page 15

<u>**Conclusion**</u>

      For the reasons discussed above and based on the authorities cited herein, it is respectfully requested that the Court sentence Jonathon Skolnick to the mandatory minimum sentence of ten years imprisonment.

      Thank you in advance for your consideration of this submission.

Very truly yours,

Avraham C. Moskowitz
Christopher R. Neff